**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-13385
_____

SOUTHEAST DEVELOPMENT PARTNERS, LLC,
a Florida limited liability company,
SOUTHEAST LAND VENTURES, LLC,
a Florida limited liability company,

*Plaintiffs-Counter Defendants-Appellants,*

*versus*

ST. JOHNS COUNTY, FLORIDA,
a political subdivision of the State of Florida,

*Defendant-Third Party Plaintiff-Counter Claimant-Appellee,*

DAYLATE ENTERPRISES, INC.,
a Florida for-profit corporation,

*Third Party Defendant-Counter Defendant.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:23-cv-00846-CRK-PDB
_____

Before WILLIAM PRYOR, Chief Judge, and BRANCH and ABUDU, Circuit Judges.

PER CURIAM:

A developer and a county government contracted to mitigate the impact a proposed development would have on public roadways. Now that mitigation costs ballooned past initial estimates, the parties disagree over who should bear the additional costs, and each accuses the other of breaching their contract. The district court granted summary judgment to the county, finding that the contract unambiguously placed the excess mitigation costs on the developer. We agree. We also agree with the district court that the developer breached the contract in several ways, but the county did not. Nor was the county's enforcement of the contract an unconstitutional exaction. But the district court erred by granting summary judgment against one of the developer's associated companies that was assigned no responsibilities under the contract. Thus, we vacate and remand the district court's grant of summary judgment concerning that company's alleged breach of the contract and affirm the district court as to the remainder of the judgment.

## I.    Background

### A. *Governing Regulations*

In St. Johns County, Florida (the "County"), new development is governed, in part, by the County's comprehensive plan governing development and zoning (the "Comprehensive Plan"). The Comprehensive Plan discourages the County from

adding development areas unless the developer shows that a proposed development provides a public benefit.  Evaluating a development's public benefit includes determining any additional burden the development would place on public facilities, including transportation, efficient land use, and the community's general infrastructure needs.

Concurrency is Florida's codified impact mitigation approach for property development.  *See* Fla. Stat. § 163.3180. Under Florida law, local governments can implement a concurrency requirement to ensure that public facilities and services will be adequate to meet a development's demands as it progresses.  *See* Fla. Stat. § 163.3180(5)(d).  Counties that implement a transportation[1] concurrency system must allow developers to mitigate a proposed development's impact by entering an agreement "to pay for or construct its proportionate share of required improvements."[2]  *Id.* § 163.3180(5)(h)1.  The developer meets this obligation concurrently with the increased infrastructure demands a project generates.  Such agreements

---

[1] Florida law allows for local governments to enact various concurrency requirements, including sewer, water, or public education facilities.  *See* Fla. Stat. § 163.3180.  Only the County's use of transportation concurrency is at issue here.

[2] The statute provides instructions for calculating a developer's proportionate share "based upon the number of trips from the proposed development."  Fla. Stat. § 163.3180 (5)(h)2a.  Neither party challenges the initial proportionate share calculation for this development.

cannot require a developer to cover existing transportation infrastructure deficiencies. *Id.* § 163.8180(5)(h)2.

In short, new developments in the County like the one at issue must show both a public benefit per the Comprehensive Plan and how the development will mitigate any costs it generates.

### B.  The Development Agreement

In September 2016, Southeast Development Partners, LLC ("Southeast Development") applied to the County for a large-scale comprehensive plan amendment for the Grand Oaks Planned Unit Development (the "Development"). The plan for the Development was to turn roughly 524 land acres into a mixed-use project including a maximum of 999 residential units, "100,000 square feet of commercial use and a maximum of 50,000 square feet of office use" along the south side of State Road 16 ("SR 16"). The Development's plan included an explanation of how the Development would provide a public benefit and mitigate its impact on public facilities.

After reviewing Southeast Development's application, the Board of County Commissioners ("BOCC") determined that the development would increase traffic on public roads beyond their then-existing capacity, including the parts of SR 16 closest to the development. In response, Southeast Development proposed that it would widen three miles of SR 16 around the development's entrance (the "SR 16 improvements"), which the parties estimated would cost $15,013,392.49. Notably, this proposal involved Southeast Development completing the improvements, as opposed

to paying for the County to complete them.  The County agreed to the proposal, and the parties entered a "Concurrency and Impact Fee Credit Agreement" (the "Agreement").

Here is how the parties formalized the proposal in the Agreement.  At a high level, Southeast Development agreed to pay for and construct the SR 16 improvements, with a portion of the money it paid counting towards the Development's proportionate share to mitigate the Development's effects on traffic and the remainder serving as the Development's public benefit. Importantly, Southeast acknowledged that the initial calculations for the SR 16 improvements costs in the Agreement were estimates. And as we will discuss, Southeast agreed to assume all costs for those improvements.

Now for the details.  As to costs that Southeast Development agreed to take on:  The Agreement's section 4(a) stated that the "opinion of probable construction costs estimate" was that the total cost to "improve all deficient roadways" in the project area was $42,515,248.  Of that estimate, the "proportionate fair share" for Southeast Development to mitigate the Development's effects was $10,132,643.  Per section 4(c), the sum of Southeast Development's proportionate share contribution and its public benefit contribution was $15 million.  So of the $15 million, and consistent with the estimate, $10,132,643.00 would count as Southeast Development's proportionate share contribution to mitigate the Development's transportation impacts, and the remaining $4,867,357.00 would serve as the project's public benefit.

Section 4(d) explained that Southeast Development would use the funds to complete the SR 16 improvements, which per the "preliminary engineering cost estimate for the design, permitting, and construction" of the project would cost an estimated $15,013,392.49, which the Agreement defined as the "Estimated Total Cost."

The Agreement's section 4(e) allowed Southeast Development to fund the SR 16 improvements over time, concurrent with the BOCC's approval of new portions of the development.   BOCC would hold Southeast Development's payments toward this obligation over time in "a separate escrow account . . . to be used only for the SR 16 [i]mprovements." *Id.* § 4(e)(iv)(b).  The payments into escrow amounted to $7,500 per approved unit for the first 212 units, and $15,000 per unit beginning with the 213th unit, up to the maximum of 999 units and a total of $13,395,000 paid into escrow.  The Agreement provided for the escrow funds' disbursement as follows:

> At the time [Southeast Development] achieves Commencement[3], [Southeast Development] may apply to the County for a release of the Escrow Funds to [Southeast Development], which [Southeast Development] shall then have the right to use for payment of all Pre-Construction Costs, Permits Costs and costs related to construction of the SR 16

---

[3] The Agreement defines "Commencement" as Southeast Development "posting a bond for the SR 16 [i]mprovements."  As we will discuss, Southeast Development never reached that point.

> [i]mprovements (the "Construction Costs"). [Southeast Development] understands that the Escrow Funds *shall not be sufficient* to pay the Estimated Total Cost of the SR 16 [i]mprovements and [Southeast Development] agrees that it shall pay *all costs* for the SR 16 [i]mprovements which are in excess of the Escrow Funds.

(emphasis added). In the event of a default, the escrow funds would "become non-refundable" and "be used by the County to construct a portion of the SR 16 [i]mprovements" or another road improvement project near the proposed development.

With the framework for payments defined, the Agreement also set out timelines for the parties to satisfy their respective obligations for mitigation of the development's impacts. Within 60 days of the Agreement's effective date, Southeast Development needed to: (1) commence acquisition of offsite drainage ponds for the SR 16 improvements and (2) commence design of the SR 16 improvements in coordination with the Florida Department of Transportation ("FDOT"). The Agreement further required Southeast Development to complete the pond acquisitions and road design during the "design period," which ran from the Agreement's effective date to the earlier of either (1) fourteen months after the effective date, or (2) the BOCC's approval of a plat containing the 443rd residential unit. Southeast Development also had to "apply for and pursue all FDOT, environmental and other permits and required governmental approval for the SR 16 [i]mprovements" within 30 days after the design period's end and

obtain all permits and approvals within one year of the design period's end.

For its part, the County had to include the SR 16 improvements in the "County's Five-Year Schedule of Capital Improvements in the County's Capital Improvements Element ('CIE') of its Comprehensive Plan at the next scheduled update."[4] And the County agreed to use the Agreement "as a basis for granting traffic or transportation concurrency" to the Development, but both parties expressly acknowledged that state, federal, and local permits would be necessary to authorize the Development.

Remedies for breach under section 11 of the Agreement included "all remedies available at law or in equity, including the remedies of specific performance and all forms of injunctive relief." Further, the Agreement authorized the County to "halt approval of additional plats or construction plans" until Southeast Development complied with its obligations under the Agreement.

Also relevant here and included in the Agreement was "Exhibit C" containing the "SR 16 [i]mprovements and Engineering Cost Estimate" as prepared by Southeast Development's analyst, which echoed the probable cost language contained in § 4 of the contract. Exhibit C notes a probable

---

[4] We note that the County never included the SR 16 improvements in the CIE. As we will explain later, this omission did not violate the Agreement, because the next scheduled update of the CIE never occurred.

construction cost for the SR 16 improvements of $15,013,392.09 based on the preliminary design and further notes that costs "may vary with actual design and the cost of material at the time of construction."

Southeast Development and the County executed the Agreement on September 21, 2018. A short time later, on October 1, 2018, Southeast Development assigned its development rights under the Agreement to Southeast Land Ventures, LLC ("Southeast Land").[5] Specifically, the assignment stated that

> [Southeast Development] sells, assigns, transfers, conveys, and allocates to [Southeast Land] all of [Southeast Development's] present and future rights, title and interest, if any, relating to the Property in the following[]: existing permits, approvals, rights, plans, reports, studies, site plans, surveys, marketing and engineering studies and reports, engineering plans, warranties, utility rights and capacities including all water and sewer agreements, guaranties, bonds and similar rights and interests relating solely to the Property, including but not limited to, all site improvement construction plans and engineering drawings together with all other planned unit development rights, entitlements and concurrency

---

[5] The Agreement, in section 13, provided that "[t]he rights and obligations of [Southeast Development] may be assigned and delegated to a successor or owner/developer."

and impact fee agreements pertaining to or benefiting the Property issued by [the County]

Shortly after the assignment, Southeast Land asked to toll several of its deadlines for the Development. First, Southeast Land sought tolling for the opioid epidemic, Hurricane Maria, and Hurricane Florence. Then it submitted another request following Hurricane Dorian. Finally, Southeast Land sought tolling because of the Covid-19 pandemic.

Southeast Land ran into obstacles as it pursued the SR 16 improvements. In September 2021, Southeast Land learned from FDOT that Southeast Land's initial plans required a "complete redesign" that would increase the SR 16 improvement's cost to roughly $57 million. This drastically increased cost from the original $15 million estimate pushed Southeast Land to seek changes to the Agreement. After receiving FDOT's feedback, Southeast Land proposed to the BOCC that Southeast Land would pay $15 million to FDOT so that the state could design and complete the SR 16 improvements in its stead.[6]

The BOCC held a hearing on February 21, 2023, on whether to accept Southeast Land's proposal to pay $15 million to FDOT in

---

[6] At this point, Southeast Land and its affiliates had begun paying funds toward the escrow account as the Agreement required and concurrent with the approval of new plats. The total escrow amount in the account at the time of the district court proceedings was roughly $5 million, and the parties agree this amount represents the appropriate payments to that account.

lieu of completing the SR 16 improvements itself. The BOCC rejected Southeast Land's proposal. And because Southeast Land had neither acquired the necessary drainage ponds nor finished designing the SR 16 improvements, the BOCC found Southeast Land in default of the Agreement. That finding led the BOCC to order the transfer of the roughly $5 million in the escrow account to FDOT to begin the SR 16 improvements.

### C. Procedural History

On March 14, 2023, Southeast Development sued the County in Florida state court following the BOCC's finding that Southeast defaulted. The County counterclaimed against Southeast Development and Southeast Land (together, "Southeast") seeking either a declaratory judgment that Southeast breached the contract or a declaratory judgment for specific performance.[7]

Southeast Development brought four causes of action. Count I sought declaratory relief finding that the County's interpretation of the Agreement and finding of default were invalid, illegal, and unconstitutional. Count II sought a permanent injunction enjoining the County from continuing alleged breaches[8]

---

[7] The County also impleaded Day Late, the owner of the to-be-developed property. The court dismissed Day Late from this case, and Day Late is not directly involved in any claims on this appeal.

[8] These alleged breaches included failing to adopt the SR 16 improvements into the County's CIE, failure to properly account for Southeast's payments,

of the Agreement and from disbursing the escrow funds to FDOT, which disbursal Southeast claimed was inappropriate as Southeast had not breached the contract. Count III sought a finding of inverse condemnation under the Florida Constitution, article X, § 6(a). Finally, Count IV sought a finding of unlawful exaction under 42 U.S.C. § 1983 because "the County extortionately leveraged its police powers to require [Southeast] to pay $15 million" for the County to approve the Development and further "leveraged" those powers to require Southeast to pay the full cost of the SR 16 improvements when the costs drastically exceeded the initial $15 million estimate. After the plaintiffs amended their complaint to add Southeast Land as a co-plaintiff, the County removed the action to federal court.

Once in federal court, the County counterclaimed, alleging that both Southeast Development and Southeast Land breached the Agreement with the County and requested declaratory judgment confirming the County's ability (1) "to halt the approval of additional plats or construction plans," (2) to retain the escrow funds in accordance with the Agreement, and (3) to require that Southeast Land assign the road planning documents and any permits to the County for no cost. The County also requested a judgment declaring that the Agreement obligated Southeast to pay all costs for the SR 16 improvements despite the increase from the initial $15 million estimate.

---

failing to maintain Southeast's payments in a separate escrow account, and failing to cooperate with Southeast to carry out the Agreement.

Each party moved for summary judgment. The district court granted the County's motion and denied Southeast's motion. As relevant to this appeal, the district court first determined that the Agreement obligated Southeast to pay "all costs for the SR 16 [i]mprovements" in their entirety, even if they exceeded the $15 million total cost estimate, and that Southeast breached the Agreement by failing to timely acquire offsite drainage ponds and coordinate the road design with FDOT. The district court then outlined the remedies available to the County under the Agreement and declared that the County could

> (1) halt approval of additional plats and construction plans within the [Development] until and unless [Southeast Land] complies with the terms and conditions of Sections 4 and 5 of the Agreement[9]; (2) declare the [incremental payments] held in the separate account as non-refundable . . . [and to] be used by the County to construct a portion of the SR 16 [i]mprovements or another road improvement within the project impact area; and (3) require [Southeast Land] to assign the Road Design documents and any Permits to the County, free of charge, within thirty (30) days of the entry of judgment.

---

[9] Section 4 outlined the "Total Proportionate Share Obligation and Payment Schedule," while Section 5 described Southeast's "Specific Obligations and Rights."

The district court also rejected Southeast's unlawful exaction claim because it found that Southeast could not show that the County's decision to hold Southeast responsible for the increased SR 16 improvements costs under the Agreement or any other conditions the County placed on its approval of the Development "lacked an essential nexus to a public purpose," which is all that the Supreme Court requires to defeat an unlawful exaction claim.[10] *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605–06 (2013). The district court awarded the County its costs incurred in the action other than attorney's fees.

Southeast then filed a motion to stay the judgment and the district court's costs award pending appeal. In opposing that motion, the County submitted a letter that stated the property owner had "on September 20, 2024, . . . terminated its Development Services Agreement with Southeast Development Partners, LLC, its assignee Southeast Land Ventures, LLC, and any and all agents or representative of same." Further, the letter stated that the property owner had "on October 2, 2024, . . .terminated its Purchase and Sale Agreement with Southeast."[11] The County argued that these two facts meant that Southeast no longer had any

---

[10] The district court also found that Southeast lacked standing to bring an inverse condemnation claim. Southeast does not challenge this finding on appeal, and we do not review it. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) ("[A] party abandons an issue by failing to list or otherwise state it as an issue on appeal." (quotation omitted)).

[11] The property owner also sued Southeast in state court alleging breach of a contract, which the parties later agreed to dismiss without prejudice.

legal right to continue work on the Development, so the balance of equities did not favor staying the judgment. The district court denied Southeast's motion.

Southeast timely appealed. The County then moved to dismiss the appeal for a lack of standing or as moot because Southeast no longer had the right to proceed with the development. We carried the motion to dismiss with the case.

## II.    Discussion

We review orders on summary judgment de novo, applying the same standard as the district court. *Hearn v. McKay*, 603 F.3d 897, 901 (11th Cir. 2010). Under that standard, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We also consider questions of appellate standing de novo. *See Kimberly Regenesis, LLC v. Lee Cnty.*, 64 F.4th 1253, 1258 (11th Cir. 2023).

There are four issues before us on appeal. First, the County argues that we must dismiss this appeal as moot because Southeast[12] is no longer able to develop the property and thus does not have appellate standing. Second, Southeast argues that the

---

[12] As noted above, we refer to Southeast Development and Southeast Land together as Southeast throughout this opinion. For clarity, we continue that convention in addressing together the arguments of both entities. That said, for the reasons discussed below, we conclude that only Southeast Development could breach the Agreement, and nothing in this discussion should be construed to contradict that conclusion.

district court erred in granting summary judgment to the County on the breach of contract claims for three reasons: (1) the Agreement did not require Southeast to pay for all costs of the SR 16 improvements; (2) Southeast did not breach the Agreement because declarations of states of emergency tolled Southeast's deadlines for project performance; and (3) the County breached the Agreement by failing to add the SR 16 improvements to the County's schedule of capital improvements. Third, Southeast argues that the court erred in granting summary judgment to the County on the unlawful exaction claim. Finally, Southeast contends that the district court's entry of judgment against Southeast Land following the Agreement's assignment was improper. We address each issue in turn.

## A. Standing and Mootness

The County argues that there has been a "material change in circumstances in the status of the parties so as to eliminate any justiciability" of the case. Specifically, Southeast "no longer hold[s] any interest or rights as to the development" in the wake of the property owner terminating its contracts with Southeast and the reversion of the property to the owner. Thus, the County argues that even if the "County breached the Concurrency Agreement" and "imposed a monetary exaction with no nexus or proportionality," our ruling "would have no practical effect" on Southeast because Southeast lacks "any right or ability to engage in any development activities related to that development," thus rendering the case moot. The County also argues that Southeast's

"interest in avoiding liability or prejudice in the state court action [brought by the property owner] through the Final Judgment does not establish justiciability" because the property owner was not a party to the final judgment. And finally, the County argues that an interest in attorneys' fees does not establish standing for Southeast. Southeast argues to the contrary: because of its ongoing state court litigation with the property owner, which may reinstate its right to develop the property as initially intended, Southeast claims it has an ongoing interest in the development of the property. We find that Southeast has standing to bring this appeal because it was injured by the district court's decision below and the case is not moot.

The U.S. Constitution limits the jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2. Accordingly, "[l]itigants must establish their standing not only to bring claims, but also to appeal judgments." *Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1353 (11th Cir. 2003). "To establish appellate standing, a litigant must 'prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'" *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)). The requirements for appellate standing resemble the standing requirements that plaintiffs must meet to bring a case in the first instance. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998) (noting that Article III standing to sue requires the "triad of injury in fact, causation, and redressability").

But, while they are "similar and overlapping, the doctrines of appellate standing and trial standing are not identical." *Wolff*, 351 F.3d at 1353. "The 'most obvious difference' is that 'standing to appeal' requires an 'injury caused by the judgment' while 'standing to bring suit' requires an 'injury caused by the underlying facts.'" *Kimberly Regenesis*, 64 F.4th at 1259 (quoting 15A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3902 (3d ed. & Supp. Sept. 2022)). "In other words, 'in the context of appellate standing, the primary meaning of the injury requirement is adverseness: Only a litigant who is *aggrieved by the judgment or order* may appeal.'" *Id.* (quoting *Amodeo*, 916 F.3d at 971) (alteration adopted) (emphasis added).

In *Kimberly Regenesis*, we addressed whether two appellants, a county and a county commissioner, had standing to appeal the district court's determination that the county commissioner was subject to a deposition subpoena in a case brought against the county and that quasi-judicial immunity did not apply. *Kimberly Regenesis*, 64 F.4th at 1259–64. We noted that the county lacked standing because, while it had lost when it was a party litigating this issue below, the judgment did not actually aggrieve the county because the appeal addressed "the commissioner's quasi-judicial immunity, not the county's." *Id.* at 1259. Thus, "[b]ecause the immunity does not belong to the county, the county [was] not aggrieved by the district court denying the immunity," and the county could not appeal the judgment. *Id.* at 1260.

The commissioner lacked appellate standing as well, but for a different reason: he was never a party to the case. *Id.* at 1260–61. We observed that a person may have an interest in a case without being a named party, but that interest normally arises for persons who either (1) intervene in the case or (2) are nonparties who "*participated* in the case before the district court." *Id.* (emphasis in original).    Because the commissioner qualified for neither exception and did not appear in the case until it was on appeal, he lacked appellate standing. *Id.* at 1262.

Here, Southeast possesses appellate standing because, unlike the parties in *Kimberly Regenesis*, Southeast was not only a named party and active participant in the case below, but the district court's final judgment also injured Southeast. *See Amodeo*, 916 F.3d at 971.    The district court ruled that the Agreement obligated Southeast to pay all costs for the SR 16 improvements in their entirety, including those above the $15 million estimate, and awarded the County its costs.    The judgment injured Southeast, and reversal would redress the injury.    So, Southeast's appeal satisfies the triad – there is an injury the judgment caused that is redressable and Southeast has standing. *See id.*

The County's claim that the case is moot is incorrect.    "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Soliman v. U.S. ex rel. INS*, 296 F.3d 1237, 1242 (11th Cir. 2002) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).    A live case requires that the court be able to grant meaningful relief; "'if events that occur

subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed.'" *Id.* (alteration adopted) (quoting *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001)).

Here, Southeast's dispute with the property owner may curtail its ability to develop the property. But if we were to reverse the district court and find that the County breached the Agreement, Southeast would have remedies under the section 11 of the contract against the County, including "all remedies available at law or in equity." These remedies could include a declaratory judgment that Southeast did not breach and did not have to pay the entire cost of the SR 16 improvements. Thus, a "live" issue remains that allows the Court to grant relief, and the case is not moot.[13] *See Soliman*, 296 F.3d at 1242. Accordingly, we deny the County's motion to dismiss this appeal for lack of standing or mootness.[14]

## B. *Summary Judgment Merits*

We now turn to the merits of this appeal. Southeast claims that the County was not entitled to summary judgment on the

---

[13] We do not address Southeast's alternative suggestion that we vacate the district court's judgment because we find that this appeal is not moot.

[14] The Florida state court's dismissal without prejudice of the state court suit between Southeast and the landowner does not change our analysis because Southeast has appellate standing and the case is not moot regardless of any state court action.

breach of contract claims because (1) the Agreement did not require Southeast to pay all costs related to the SR 16 improvements; (2) Southeast did not breach the Agreement because declarations of states of emergency tolled Southeast's deadlines for project performance; and (3) the County breached the Agreement by not adding the SR 16 improvements to the County's schedule of capital improvements.  We address each contention and conclude that the district court did not err in rejecting each one.

1.  The Agreement required Southeast to pay all costs for the SR 16 improvements.

Southeast argues that the district court erred in finding that the Agreement required Southeast to pay all costs for the SR 16 improvements in their entirety, including those beyond the initial $15 million estimate.  In Southeast's view, the Agreement requires Southeast to "pay all costs for the SR 16 [i]mprovements which are in excess of the Escrow Funds," but only up to that $15 million estimate, a number mentioned in the calculation of Southeast's obligations and close to the $15,013,392.49 probable construction cost included in Exhibit C attached to the Agreement.  Southeast contends that interpreting the contract without a cap on its payments toward the SR 16 improvements would be absurd and that Southeast would not have agreed to such a term.

The County argues that concluding Southeast assumed the burden of all costs to pay for the SR 16 improvements is consistent with the Agreement's plain language.  The County further

contends that nothing in Exhibit C or in the Agreement itself limits Southeast's "obligation to fund the SR 16 [i]mprovements to certain portions, phases, or particular designs of the construction."

Under Florida law[15], contract interpretation begins with a review of the contract's plain language, which is the "best evidence of the parties' intent . . . ." *Taylor v. Taylor*, 1 So. 3d 348, 350 (Fla. 1st DCA 2009) (per curiam); *Sugar Cane Growers Coop., Inc. v. Pinnock*, 735 So. 2d 530, 538 (Fla. 4th DCA 1999). Courts applying Florida law interpret words and phrases "in their ordinary sense" and do not apply "a strained, forced, or unrealistic construction." *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 736 (Fla. 2002) (quoting *Gen. Accident Fire & Life Assurance Corp. v. Liberty Mut. Ins. Co.,* 260 So. 2d 249, 253 (Fla. 4th DCA 1972)). Courts determine the legal effect of a contract's provisions from the words of the entire contract, and it is error for a court to construe a contract in a manner which leaves out words and phrases. *Sugar Cane Growers*, 735 So. 2d at 535. "[I]t is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties." *Ferreira v. Home Depot*, 12 So. 3d 866, 868 (Fla. 1st DCA 2009) (per curiam).

---

[15] The parties both cite Florida law in support of their contract interpretation arguments. Section 14 of the Agreement also provides that the Agreement "shall be governed by, construed under and enforced in accordance with the laws of the State of Florida." For these reasons, and because "state law governs issues of contract interpretation," we apply Florida state law in analyzing the breach of contract claims. *AFC Franchising, LLC v. Purugganan*, 43 F.4th 1285, 1290 (11th Cir. 2022).

The Agreement unambiguously requires Southeast to construct the SR 16 improvements without a cost limitation. Pursuant to state law, as part of its planned development, Southeast had to show the County that it would both mitigate the development's transportation infrastructure effects and show how the development would provide a public benefit. *See* Fla. Stat. § 163.3180. The Agreement provided that Southeast would pay roughly $10 million as its proportionate share of the SR 16 improvements as mitigation and an additional estimated $5 million beyond its proportionate share representing the project's public benefit. But as section 4(a) of the Agreement makes clear, those amounts were based on the "probable construction costs estimate." And § 4(d) acknowledged that $15,013,392.49 was the Estimated Total Cost, based on the preliminary cost estimate for the design, permitting, and construction costs of the SR 16 improvements. Exhibit C also acknowledged the uncertain nature of the total project costs and explained that the "estimated construction costs" were based on the "preliminary design . . . and may vary with actual design and the cost of material at the time of construction." And section 4(e) the Agreement specifically notes that these amounts are estimates only: "[Southeast] understands the Escrow Funds shall not be sufficient to pay the Estimated Total Cost of the SR 16 [i]mprovements and [Southeast] agrees that it shall pay all costs for the SR 16 [i]mprovements which are in excess of the Escrow Funds." That language, in the ordinary sense, requires Southeast to "pay all costs for the SR 16 [i]mprovements," in their entirety. *See Siegle*, 819 So. 2d at 736. In entering the

Agreement, Southeast acknowledged that what it paid into escrow was not the total cost of the SR 16 improvements or the limit of what it would bear, and in agreeing to the "all costs" language, Southeast accepted that it would pay the entire burden of the SR 16 improvements.

Southeast asks us to read into the contract an implied limit of $15 million on the costs it assumed under the Agreement. We decline to do so. *See Ferreira*, 12 So. 3d at 868. Nothing in the Agreement limits Southeast's costs to the $15 million estimate to design and construct the SR 16 improvements. Indeed, the initial estimate in Exhibit C was $15,013,392.49, in excess of $15 million, and, as discussed above, the Agreement included language acknowledging that the estimate acknowledged that the $15 million was only the parties' best estimate at the time for the SR 16 improvements cost that Southeast would bear. The Agreement therefore recognized that Southeast was agreeing to pay "all costs" for the SR 16 improvements, even if the costs exceeded the initial estimate.

Southeast's reliance on the $15,013,392.49 estimated amount listed in Exhibit C for an implied cap to its costs is similarly unavailing. As noted above, that estimate includes the notation that the estimated costs were based on a preliminary design and "may vary with actual design and the cost of material at the time of construction." While Section 4(e) of the Agreement contains language that the escrow funds would "count toward" Southeast's obligations under the Agreement, both parties knew the costs

24-13385                Opinion of the Court                25

would exceed the escrow amount. Though, under the Agreement's section 4(e), Southeast would no longer need to contribute to the escrow funds when the account totaled $13,395,000 or when construction commenced, the Agreement still required Southeast to meet the Agreement's design, permitting, and construction requirements if the amount in escrow was insufficient to cover all costs. As Exhibit C noted, the costs were based on *preliminary* design; the *actual* design required for FDOT approval when it required a "complete redesign" was much more expensive. So far from providing the cap that Southeast argues for, Exhibit C actually confirms that Southeast knew its costs would exceed $15 million at the time it entered the Agreement.

To be sure, this interpretation means the Agreement does not cap Southeast's exposure. But under Florida law, where a contract is unambiguous, our "task is to apply the parties' contract as written, not rewrite it under the guise of judicial construction." *City of Pompano Beach v. Beatty*, 222 So. 3d 598, 600 (Fla. 4th DCA 2017) (quotation omitted). We cannot vary a contract simply because a provision turns out to be ill-advised, and we cannot say that a sophisticated party assuming the potential risk or benefit in negotiating a contract is absurd, particularly when Southeast did not include an explicit cap to their costs in the Agreement. *See Ferguson v. Ferguson*, 54 So. 3d 553, 554 (Fla. 3d DCA 2011) ("[T]he bedrock principle of contract law . . . [is] that bad deals are as enforceable in the law as good deals."); *Seritage SRC Fin., LLC v. Town Ctr. at Boca Raton Tr.*, 397 So. 3d 44, 46 (Fla. 4th DCA 2024)

(holding that an agreement between sophisticated parties was unambiguous).

Southeast also argues that under Florida law, it should not be "responsible for the cost of reducing or eliminating existing deficiencies" because concurrency only requires it to mitigate the development's infrastructure effects, not pay for otherwise needed improvements that its development did not cause. *See* Fla. Stat. § 163.3180(5)(h)2 ("[A] local government may not require payment or construction of transportation facilities whose costs would be greater than a development's proportionate share of the improvements necessary to mitigate the development's impacts."). But Southeast leaves unexplained how its agreement to pay all associated costs violates this anti-deficiency provision. After all, Southeast agreed to pay more than its proportionate share to satisfy its public benefit obligations. As stated in the Agreement's § 4(a), Southeast's proportionate share, based on initial estimates, was $10,132,643.00. And per § 4(b), Southeast agreed to pay $4,867,357.00 in addition to that proportionate share as its public benefit contribution. The $15 million total of those two amounts from §§ 4(a) and 4(b) was roughly equivalent to the $15,013,392.49 in Exbibit C. But § 4(e) also notes that Southeast "understands that the Escrow Funds shall not be sufficient to pay the Estimated Total Cost of the SR 16 improvements and [Southeast] agrees that it shall pay all costs for the SR 16 improvements which are in excess of the Escrow Funds." Southeast did not negotiate contract language stating that it would pay all costs for the SR 16 improvements which are in excess of the Escrow Funds *up to the amount of the Estimated*

*Total Cost of the SR 16 improvements* (which the Agreement defined as $15,013,392.49).  The Agreement says *all* costs.

Southeast chose how it wanted to meet the County's public benefit requirement for the Development.  The Comprehensive Plan does not specifically define a developer's public benefit contribution.  Instead, it requires only that an applicant for a development demonstrate that there is one, and nothing precludes a developer from agreeing to a potentially variable amount in meeting this obligation.  We also note that Florida law allows for a developer to contract to satisfy its proportionate share obligation by "construct[ing] its proportionate share," which Southeast chose to do when it agreed to cover all costs associated with the SR 16 improvements.  Fla. Stat. § 163.3180(5)(h)c(I).  By agreeing to construct the improvements in lieu of contributing its proportionate share payment under the statute, Southeast assumed the risk of the development costing more or less than it might otherwise have to spend, if for instance it had instead contracted to pay the County $15 million to construct the SR 16 improvements.  Southeast was familiar with the distinction; it attempted to modify the Agreement and pay $15 million to the County instead before the County declared Southeast in breach.  Under the ordinary meaning of the contract, Southeast agreed to that variable amount, knowing that the initial estimate was just that—an estimate—and that actual construction costs might vary.

Accordingly, we find that the Agreement unambiguously meant what it said: Southeast must pay all costs associated with the SR 16 improvements.

### 2. Southeast breached the Agreement.

Under section 4(e) of the Agreement, Southeast had to meet various benchmarks, including acquiring offsite drainage ponds during the design period, designing the SR 16 improvements, and obtaining the needed permits for the SR 16 improvements after the design period ended. Southeast had to begin these tasks with 60 days of the Agreement's effective date and conclude the design period at the earlier of 14 months later or at the time of the County's approval of the 443rd residential unit. The Agreement required Southeast to apply for and obtain all the needed permits for the Development within one year of the design period's end. Southeast did not achieve these timing benchmarks. The district court found that the Agreement did not qualify for tolling under Florida state statute because it was not a development permit or order and at most was a step toward a permit, and that because Southeast had not performed its obligations, Southeast had breached the Agreement.

Southeast argues that the district court incorrectly found that it breached the Agreement because five states of emergency in Florida tolled the deadlines for Southeast's performance of these obligations, meaning it had not yet missed a deadline when the County declared Southeast in default. The County responds that Southeast breached the Agreement because (1) Southeast did not

24-13385              Opinion of the Court                    29

perform according to the stipulated timelines; (2) the Florida statute providing for the tolling of deadlines related to states of emergency does not apply to the Agreement; and (3) even if the statute did, Southeast did not properly notify the County of the deadlines Southeast wanted tolled.

The relevant Florida law provides that

[t]he declaration of a state of emergency by the Governor tolls the period remaining to exercise the rights under a permit or other authorization for the duration of the emergency declaration. Further, the emergency declaration extends the period remaining to exercise the rights under a permit or other authorization for 6 months in addition to the tolled period.

Fla. Stat. § 252.363(1)(a) (2018).[16]

The parties signed the Agreement in 2018. At the time, the tolling provision in § 252.363(1)(a) applied to:

1. The expiration of a development order issued by a local government.

---

[16] Florida law applies the statutory scheme in effect at the time the parties enter an agreement. *See Fla. Beverage Corp. v. Div. of Alcoholic Bevs. & Tobacco, Etc*, 503 So. 2d 396, 398 (Fla. 1st DCA 1987) ("The laws in force at the time of the making of a contract enter into and form a part of the contract as if they were expressly incorporated into it."). Florida has since amended this statute, but as the parties entered the Agreement in 2018, we apply the version in effect at the time.

2. The expiration of a building permit.

3. The expiration of a permit issued by the Department of Environmental Protection or a water management district pursuant to part IV of chapter 373.

4. The buildout date of a development of regional impact, including any extension of a buildout date that was previously granted as specified in s. 380.06(7)(c).

Fla. Stat. § 252.363(1)(a) (2018). The statute also explains that "[i]f the permit or other authorization for a phased construction project is extended, the commencement and completion dates for any required mitigation are extended such that the mitigation activities occur in the same timeframe relative to the phase as originally permitted." *Id* § 252.363(1)(c).

The County argues that the statute did not include development agreements such as the Agreement at issue here.[17] Southeast contends that the Agreement is not a development agreement and is instead a "proportionate share agreement pursuant to section 163.3180," apparently arguing that such a proportionate share agreement that sets out mitigation requirements would qualify for tolling. But we need not decide

---

[17] The Florida legislature did add development agreements to the tolling statute, *see* Fla. Stat. § 252.363(1)(a)(6) (2021), but not until 2021, well after the Agreement's effective date.

whether the Agreement qualifies as either type because the tolling statutes lists neither proportionate share agreements nor development agreements among those permits a state of emergency would extend. *See* Fla. Stat. § 252.363(1)(a) (2018). The statute lists development orders, building permits, environmental permits, and developments of regional impact, but no other "permit or other authorization." *See id.* And the statute's references to mitigation is tied to the extension of "permits or other authorizations" described in the statute, which the Agreement is not. *See id.* § 252.363(1)(c).

Nor does the Agreement qualify as a development order (not to be confused with the County's assertion that it is a development agreement.)[18]   A "development order" is "any order granting, denying, or granting with conditions an application for a development permit," Fla. Stat. § 163.3164(15) (2018). "'Development permits' include[] any building permit, zoning permit, subdivision approval, rezoning, certification, special exception, variance, or any other official action of local government having the effect of permitting the development of land." Fla. Stat. § 163.3164(16) (2018). We agree with the district court that, at most, the Agreement served as a step toward Southeast seeking the permits the Development required.

---

[18] Neither party argues that the Agreement qualifies as a building permit, environmental permit, or development of regional impact. Accordingly, we do not analyze whether the Agreement fits these categories.

The Agreement says as much. In Section 6(a), the Agreement emphasizes that the parties still had to obtain necessary permits for the Development. And under section 9, Southeast agrees to obtain those permits in accordance with federal, state, and local requirements. Given that the Agreement acknowledges the need for permits that it does not grant, we cannot conclude that the Agreement is "an official action of local government having the effect of permitting the developed land," Fla. Stat. § 163.3164(16) (2018), or that the County entering the Agreement with Southeast represented a "grant[] with conditions [of] an application for a development permit." Fla. Stat. § 163.3164(15). Thus, the Agreement is not a development order subject to tolling under § 252.363(1)(a).[19]

Accordingly, because the Florida states of emergency did not toll the timelines specified in the Agreement, and Southeast did not perform under the original timelines, Southeast breached the Agreement.

3. The County did not materially breach the Agreement

Southeast argues that the County breached the Agreement by failing to adopt "the SR 16 [i]mprovements into its Five-Year Schedule of Capital Improvements in the Capital Improvements

---

[19] Southeast contends that the development order it sought to toll was the authorization for the Development, which it asserts would qualify as a development order, not the Agreement. But the requirements for design and obtaining permits were part of the Agreement, which does not qualify for tolling, as explained above.

Element of its Comprehensive Plan" as section 7 of the Agreement required.  Doing so, Southeast argues, would have given the Development "some level of priority by the County, as well as visibility to the general public" and allowed the County to "enter[] into other proportionate share agreements to put funds towards the roadway or identif[y] other funding sources."  The County responds that it did not breach the Agreement because, while the Agreement requires the County to add the improvements into the schedule at its first update, it has not yet updated the schedule.  The County also argues that, even if the failure to do so was a breach, it was not a material breach, because adding the improvements into the plan would not have changed the costs Southeast agreed to bear and did not go to the essence of the Agreement.

Breach of contract claims in Florida require a party to establish "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from that breach." *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1313 (11th Cir. 2019) (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (emphasis omitted).  A party materially breaches when he "fail[s] to perform a duty that goes to the essence of the contract and is of such significance that it relieves the injured party from further performance of its contractual duties."  *Burlington & Rockenbach, P.A. v. L. Offs. of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. 5th DCA 2015).  "[T]rivial noncompliance and minor failings do not constitute material breaches."  *Id.*

As an initial matter, the record does not show that the County breached the Agreement. The Agreement required that

> [t]he County will adopt [Southeast's] Transportation Contribution . . . into the County's Five-Year Schedule of Capital Improvements in the County's Capital Improvements Element ("CIE") of its Comprehensive Plan at the next scheduled update.

Southeast argues that Florida law requires the County to review its Capital Improvements Element "on an annual basis." Fla. Stat. § 163.3177(3)(b). That may be so. But reviewing a plan and updating it are not the same thing. The district court correctly noted that the Agreement only requires inclusion of the SR 16 improvements "at the next scheduled update." The record does not indicate when the "next scheduled update" to the plan was to occur or if it even has. It also does not show the County's failure to update the plan at that indeterminate time.

But even if the County did breach the Agreement in failing to update the plan, such failure was immaterial. As we have discussed, the Agreement obligated Southeast Development (and no one else) to pay "all costs" of the improvements. Southeast does not explain why inclusion of the improvements into the plan would have resulted in state or local government funding priority for a project that Southeast had already agreed to pay for. Nor does Southeast explain why the County would have solicited additional proportionate share agreements to fund those same improvements. Thus, such inclusion would not have materially

affected Southeast's burden under the Agreement.  And even if adding the improvements to the CIE would have increased their "visibility to the general public," such visibility did not go to the "essence" of the contract, and any noncompliance on this point was trivial.  *See Burlington*, 160 So. 3d at 960.

### C.  Unlawful Exaction

The district court granted the County summary judgment on Southeast's § 1983 claim that the County holding Southeast accountable for the increase in the costs of SR 16 improvements amounts to an unconstitutional exaction.  Southeast argues that the district court erred because enforcing the Agreement amounts to a taking that lacks an essential nexus to a legitimate state interest and was not roughly proportionate to the development project's impacts.  The County responds that requiring Southeast to pay the increased costs of the SR 16 improvements is not an unlawful exaction because Southeast, in the Agreement, assumed the burden of any price increase when it agreed to construct the improvements rather than negotiating to merely pay the estimate improvement costs upfront, as it tried to do shortly before the County declared Southeast in breach.  Southeast replies that the unconstitutional burden overcame the Agreement and rendered it unenforceable.

The Supreme Court established the test for an unlawful exaction in *Koontz*.  570 U.S. at 606.  As explained in *Koontz*, "the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it

may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." *Id.* If there is no nexus and the demands are not roughly proportional to the impacts, the demands are extortionate. *Id.* Monetary exactions must satisfy the same nexus and proportionality requirements. *Id.* at 612. An unconstitutional land-use exaction occurs when the government requires the landowner to surrender property in exchange for land-use permits, unless the transfer meets the nexus and proportionality requirements. *Id.* at 606; *see generally Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994).

Where a claim alleges that an unlawful exaction has occurred in conjunction with the granting of a development permit, we first consider whether an "essential nexus" exists between a "legitimate state interest" and the permit condition exacted by the government. *See Dolan*, 512 U.S. at 386 (*citing Nollan*, 483 U.S. at 837). After establishing that an essential nexus exists, the Court "must then decide the required degree of connection between the exactions and the projected impact of the proposed development." *Id.* Stated simply, the government may "condition approval of a permit on the dedication of property to the public so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal." *Koontz*, 570 U.S. at 605–06.

Assuming the County must establish that the agreement meets the nexus and proportionality requirements, the requirements are satisfied here. *But see Koontz*, 570 U.S. at 604–05 (explaining that nexus and proportionality are implicated "when *owners* apply for land-use permits" (emphasis added)). The Agreement between Southeast and the County allows Southeast to mitigate the development's transportation impacts, a legitimate state interest. *See Dolan*, 512 U.S. at 387–88 (explaining that attempts to reduce local traffic congestion by a municipality qualify as a legitimate public purpose). And the concurrency mechanism allows developers to pay costs that are roughly proportionate to their projects' effects upon agreement with the local government. *See* Fla. Stat. § 163.3180(5)(h)1. So to the extent Southeast argues that the proportionate fair share it agreed to pay as part of the concurrency agreement was an unlawful exaction, that argument fails. But the variable cost (the "public benefit" from section 4(b) of the agreement) is also not an unlawful exaction. Southeast's conduct explains why.

In signing the Agreement, Southeast confirmed what contribution amount it considered roughly proportionate to its development proposal when it agreed to construct the SR 16 improvements estimated to cost more than $15 million. Southeast had a choice between paying for the SR 16 improvements or constructing them itself, and it chose the latter. *See* Fla. Stat. § 163.3180(5)(h)1.c. In doing so, it voluntarily assumed full responsibility for completion of the SR 16 improvements to satisfy its concurrency requirements as well as its public benefit

demonstration. It did so despite the availability of alternative avenues to satisfy its mitigation and public benefit requirements, and cannot now argue that the conditions it put forward and agreed to are unconstitutional. If the improvements had cost less than the Agreement estimated they would, then Southeast would have benefited from that windfall. We will not declare the Agreement unconstitutional simply because it shifted from a boon to a burden for Southeast. *See Ferreira*, 12 So. 3d at 868.

Nor can Southeast claim that the concurrency agreement became an exaction after the fact when the SR 16 improvements costs increased. Per *Koontz*, an exaction is not unlawful if it meets the nexus and rough proportionality requirements. 570 U.S. at 605–06. The parties agreed that the SR 16 improvements were necessary to meet both Southeast's traffic mitigation and public benefit demonstration requirements. The agreement *estimated* the SR 16 improvements costs. The nexus between the SR 16 improvements and approval of the Development remained even when the costs to complete the improvements ballooned because the development would still generate the need for the improvements. And as for rough proportionality, section 4(a) of the Agreement calculated Southeast's proportionate share amount based on the estimates available at the time. *Southeast* offered to pay the difference between what mitigation required and what the SR 16 improvements cost as the Development's public benefit. We see no violation of rough proportionality when a developer's costs increase at the same time the cost of the overall project increases, especially when those costs were known to be variable at the time

of the Agreement.[20]    At bottom, we conclude that Southeast accepted an arrangement to advance its Development that resulted in a variable cost.  Southeast's desire not to pay that variable cost is not a basis for us to overturn the contract.

Thus, the County has shown as a matter of law that holding Southeast to the terms of the Agreement was an unconstitutional exaction, and the district court properly granted summary judgment to the County.

### D.  The Assignment's Effects

One final matter remains.  The district court granted the County's motion for summary judgment as to all counts in the amended complaint and the second amended counterclaim. Southeast argues that decision was error because Southeast Development only assigned its rights under the contract to Southeast Land and that Southeast Land could not breach responsibilities it did not accept.  To the extent the district court's judgment found that Southeast Land breached the Agreement, that was error.

---

[20] We note that there are no allegations in the record that any of the parties intentionally misstated the estimated costs of the SR 16 improvements to force Southeast to bear the significantly higher costs that became necessary to complete the project.  Rather, the record reflects that the costs increased due to FDOT requirements unknown at the time the parties entered the Agreement.  Thus, we need not consider whether an unlawful exaction occurs when a local government intentionally underestimates the costs of a project in order to force an applicant to bear the higher actual costs that the government knew were necessary.

Under Florida law, an assignment of rights does not include an assumption of liabilities by the assignee unless the assignee expressly agrees. *See Jenkins v. City Ice & Fuel Co.*, 118 Fla. 795, 801 (1935) ("The assignment of a personal contract does not give to the other party to the original agreement a right of action against the assignee for its breach, nor is the mere assignee liable unless he has expressly agreed to become bound or has promised upon a sufficient consideration to perform for the benefit of a third party.")

The Agreement allowed Southeast Development to assign its "right and obligations . . . to a successor or owner/developer . . . ." Southeast Development chose to assign all its "present and future rights, title, and interest, if any" to Southeast Land, including "concurrency and impact fee agreements pertaining to or benefiting" the development. In short, Southeast Development assigned its rights under the Agreement to Southeast Land, but not its obligations, which go unmentioned in the assignment. It is axiomatic that a party cannot breach a contract that it has no responsibilities under, and thus judgment against Southeast Land on the breach of contract claim was error.[21]

We therefore vacate the district court's judgment against Southeast Land concerning breach of contract, and remand for the

---

[21] The County did not contest the issue of the assignment of obligations to Southeast Land in its brief, and counsel for the County at oral argument conceded that judgment was appropriate only against Southeast Development and not Southeast Land on the County's breach of contract claim because of the assignment.

district court to modify the judgment to indicate that only Southeast Development breached the Agreement and was obligated under the Agreement to pay all costs for the SR 16 improvements.[22]

### III.    Conclusion

For the foregoing reasons, we deny the County's motion to dismiss this appeal, and we affirm the district court's grant of summary judgment to the County except as to the judgment against Southeast Land on the breach of contract claims.  We vacate and remand for the district court to modify the judgment and clarify that only Southeast Development breached the Agreement.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

---

[22] We note that even though Southeast Land could not breach an agreement under which it had no responsibilities, the district court did not err in declaring the County's authority under the contract to "halt approval of additional plats," declaring the escrow payments forfeit, and requiring the assignment of "the Road Design documents and any Permits to the County."  Those remedies were consistent with the County's rights to enforce the Agreement upon a breach.